which is Camacho v. Nationwide Insurance. Good morning, and may it please the Court. Michael Kenney on behalf of Nationwide, the appellant. The judgment below should be reversed because the time-limited demand letter, one, did not offer to settle claims within the policy limits, and two, did not provide substantiating information about the proper claimants. In short, the demand letter was a legal nullity. Nationwide had no duty to respond to that letter, nor did it have any duty to accept it. There are four cases that inform the decision, two from the Georgia Supreme Court. One is the Holt case. The other is Cotton States v. Brightman. And what they say in combination is that there is no duty simply to respond to a time-limited demand letter within the time prescribed by the claimant's attorney. And if, in fact, the demand letter offers to settle the case but not within the policy limits, there is no duty to negotiate. That was the animating principle on the two cases that control the disposition of this case. That's right, but what you have to be able to show is that the offer that you got from the plaintiffs was not capable of acceptance. And my question to you is there may have been plurals and singulars remixed, but in the letter the estate was mentioned as well as the wrongful death. It was perhaps not artfully done. And I believe the big part of your argument here is that you couldn't settle under those terms because there was always the possibility that some looming complaint against the estate would be filed second. And my question to you is why wouldn't it have been simple enough just to write and clarify and say just make sure here now you mean both the estate and the wrongful death claim? Why wouldn't that have been a reasonable thing for the insurer to do? Two reasons, Your Honor. First, it goes back to Brightman. Brightman says if the offer doesn't go into settle the case within the policy limits, there's no duty to negotiate, which means there's no duty to pick up a phone and ask for any clarification. But you talk about set-ups and gotcha. Isn't that sort of a gotcha from your point of view if you can find some little ambiguity? Wouldn't it just from a reasonable person's point of view write them back and say, you know, you've mentioned both words. I just want to make sure and we will settle. Precisely the opposite, Your Honor. And it's the Fricke v. Jones case that we cited in our brief, Georgia Supreme Court case. That case says, remember, this was an offer. And the offer, the offeror is the master of his or her own offer. And to accept the offer. Counsel, I'm looking at Fricke. And it says one party's intention is deemed to be the meaning a reasonable man in the position of the other contracted party would ascribe to the first party's manifestation of assent. And in making those determinations, you look at the circumstances surrounding making of the contract and so forth. And why wouldn't we look at the circumstances surrounding the April 18th demand? And Fricke goes on to say, Your Honor, that you either accept the offer unconditionally. You can't do anything other than to accept it without variation. Those are the words from Fricke. Here what you have is a letter where the lawyer writes the letter and he says, on the one hand, I represent Mr. Camacho. Do you agree, if you look at the extrinsic evidence, the communication between the parties, that you would come to the determination that both parties were a part of this April 18th letter? Would you agree with that? Not at all, Your Honor. Okay, tell me, if you would then, was there any extrinsic evidence? So you don't agree that, and so, I mean objective evidence. Right. That McAleer only was offering to settle one of the two claims. Right. Mr. McAleer says in his letter of April 18th. No, no, other than, I'm talking about extrinsic evidence. Let me go through my question again. Assuming you look at the April 18th letter and you use extrinsic evidence, would you agree that all of the extrinsic evidence would make one conclude that the April 18th letter applied to both claims? No, Your Honor. Okay, then my question is, what objective evidence, extrinsic evidence, do you have outside the letter that would lead you to the conclusion that the letter was only referring to one claim? Because we only have, we have to guess, Your Honor, under OCGA. So you have no extrinsic evidence that would support viewing the letter as pertaining to only one claim? Because the estate hadn't been created yet. The estate doesn't have the claim for survival. A personal representation. I'm just asking for a yes or no. So you have no extrinsic evidence. Is that right, that would support your view that the April 18th demand letter was for only one claim? Correct. The way you're framing the question, the answer is yes, but we don't need extrinsic evidence. Okay. We have the language of the letter itself. And in the letter — And so I would conclude, then, that it's your position that you just look at the letter, you do not look at extrinsic evidence to determine what the letter said. That's right, Your Honor. Okay. I mean, that's the clear holding of Brightman. That's what happened in Baker v. Huff. That's what happened in Linthicum. Well, one practical problem, though, is if that was the real holdup for your agent, that concern about whether the estate was being settled. These later letters, it seems your entire concern was not the estate, not at all. Your concern was the limited release versus general lease. So it makes it harder to believe that you were truly confused about the estate business when all the letters after that suggested there was no confusion at all on Nationwide's part. When you step back on the preface of your question, Judge Carnes, remember what the duty is here with regard to the insurance company. The duty is to protect the funds of the insured. And what Nationwide attempted to do was protect those funds. The way to protect those funds under the circumstances of this case where the insured was convicted of vehicular manslaughter, where you knew there was going to reasonably believe that there would be a wrongful death claim, a survival claim, and a dram shot claim, which actually materialized. But you're saying the letter was a setup. It was ambiguous. Yes. A couple things militate against that. One, in the answer to the complaint, you admitted that the letter was an offer to settle all claims. That's one. Two, in the demand, the letter says we make this good faith offer to settle all claims. Three, punitive damages can only be realized by an estate in Georgia. So I would think veteran adjusters or lawyers would see this is for not only the wrongful death but the estate. So, again, going back to Judge Carnes and Judge Black, what other than what seems to be pretty clear and what you originally said, yeah, it was all claims, suggests that that's not the case now after a jury verdict against your client? It goes back to the, Judge Williams, it goes back to the text. I mean the text, when a lawyer says I represent two parties for two separate claims and then specifically says I'm going to only, I'm going to seek the policy limits of $100,000 on behalf of one claim. One claim, one claimant. Specific. Expressed. The clear implication is it would have been easy for him. All he had to do was say if he represents two claimants and wants the policy limits for both claims for both claimants, say it. Lawyers do this all the time. He compounds the error by going on to the second sentence and once again refers in the singular one claim to one client. But Breitman, I don't understand your assessment of Breitman. That gives you safe harbor. That says on the things we can control, we settle. So why wasn't that the answer? Because what Breitman says, remember the circumstances here. The offeror here in a time-limited demand has all the power, all the control, and all the leverage. Right. Time-limited meaning he gave you 10 days after eight months. There was somebody who died. So you had eight months of this adjuster talking to people, getting all kinds of facts. So it's not time-limited. It's not like, oh, gosh, we haven't had a chance to investigate. It is, but it's important because that offer is essentially at that time was take it or leave it. Other than if there's not an unconditional acceptance of the offer as made, then the insurance company is set up for a bad-faith claim. That's why it is so incumbent on the offeror to come forward just like he did. That was the essential holding in Baker v. Huff. That's why the plaintiff lost. You are supposed to behave reasonably toward your insured, and it would seem to be on something here where it's not just the letter just said wrongful death. I mean, it is if there's some ambiguity and artfulness. You come back. You've got 10 days, not a lot of time for sure. But day two, you come back reasonably and say, I think you mean both claims, but I want to clarify that you mean both claims, and we will settle. We'll give you everything. If you mean both claims, please clarify. If they don't come back at that point, then you've got a good argument that you acted reasonably and they were setting up. But if you just stand mute and, in fact, your agent was three days late, she didn't do anything at all, then it's harder, I think, to attribute reasonableness to the behavior of the insurance company. We had already done that, Your Honor. We had already said repeatedly. The adjuster said repeatedly we need a general release with indemnification. That's our duty was to the insured. That's what we were protecting. Well, that's a different issue now than estate v. wrongful death. That's the other part of your argument, the difference in the general and the limited release. But that was the issue that was created because then the demand letter comes in and it doesn't purport to release the estate claim, and that had been an issue of contention all along. That nationwide was consistent for the entire time. To protect its insured under the circumstances of this case, a vehicular homicide, you had to have to protect his funds and his assets. You needed a release of both claims and indemnification for a contribution claim. I see that my time is running short. I'd like to address the damages issued quickly and the standard. The damages here, what the plaintiffs are asking this court to do, even though no Georgia Supreme Court case has ever held that damages as a matter of law are the excess verdict. Here, such a rule of law would completely upset the entire tort system. The tort system is based on compensation. The question is, what's the money that would compensate Mr. Park, the insured here? And here, there was an $8.1 million judgment. There is zero evidence in this record that, in fact, he was going to have to pay anything like that. There was no evidence. Here, if, in fact, such a rule of law is applied without variation, without any consideration of the financial circumstances of the insured, it would run afoul of the United States Constitution. It cannot be constitutionally applied. You don't. What's your best case on that? Farm v. Campbell, U.S. Supreme Court, BMW v. Gore. Saying that if the insured doesn't have the money that might become liable to the insurer in a bad faith, then they can't bring a bad faith claim. Oh, yes, they can. Oh, yes, they can, Your Honor. They can bring a bad faith claim, but what happens here is if a bad faith claim is brought and there's a judgment against the insured, remember, the whole point of this is to compensate the insured, not compensate the accident victims. So the only way the insured has to pay $8 million in a judgment is if the insured has the $8 million. If he's judgment-proof, he doesn't need that money. And any decision, any rule of law applied in this case would simply be a substitution of compensation to the insured and punishment of Nationwide, and that would run afoul of the U.S. Constitution. Thank you. All right, thank you. My name is Jay Saad. I'm here for the appellees. Richard Dolder is my co-counsel to the right. Of course, we have to take these claims made by Nationwide and the friends of the court that file briefs here very seriously because if they are successful, they would devastate the law as we know it. Actually, if the case is decided on the narrow ground we've talked about, I'm not sure how devastating anything would be. Say again, Your Honor. I'm sorry. I'm not sure. I mean, we've been talking about a very narrow factual question. Well, we are. I'm not sure how devastating a ruling either way would be on that. Well, I was referring to something that has yet to be argued in oral argument here, but the defendants and the friends of the court that have filed briefs along with them are trying to, we think, change the law from negligence for which an insurance company should be able to be held liable and can be held liable under the law. They're trying to claim what we think sort of pined for an arbitrary and capricious standard, and that standard is just not anywhere in the law. They've argued it in their briefs. Since it wasn't argued, they'll stand on their briefs, so you might want to address what was argued. In oral argument? In oral argument, we're very brief on this because I think that the letter speaks for itself. Without really arguing, I would just say that the letter says what it says. And, of course, we've highlighted it here, but it sounds like the court already knows that in the very first sentence of the demand letter, it says, Dear Ms. Wilson, who's a nationwide adjuster in this case, as you are aware, our firm, the Mackler firm, has been retained to represent Mr. Jesus Camacho in relation to the wrongful death of Stacey Camacho. Then the second sentence of this five-page letter says, We also represent the estate of Stacey Camacho relating to injuries to Stacey Camacho, et cetera. As the court has already pointed out and knows, the damages incurred that were being settled to settle both claims include the estate claim, which is at the bottom of the page here. I have other highlighted ones if the court would like. That can only be an estate claim. Medical expenses on page 3 that are being settled can only be an estate claim. Punitive damages can only be an estate claim. There was just no confusion. The demand for settlement and compromise says, quote, We make this good faith offer to settle all claims, plural, within a reasonable time. And that's a quote. Here's the kicker on page 4. Settlement proceeds will be held in trust until all necessary court approvals are obtained for the settlement of the estate of Stacey Camacho. There's simply, it wasn't ambiguous. It was not a model of clarity, as Judge Totenberg said. But in the same sentence, Judge Totenberg wrote, It is not a model of clarity, but we cannot say that it is so vague to be unenforceable. Was it your expert or Nationwide's expert that said that this was a standard practice to hold settlement proceeds in trust until the probate can all be worked out? If I recall correctly, Judge Williams, I think they both agree on that. Okay. And I think my guess is that even Nationwide's lawyers and adjusters would admit that that's pretty standard practice. Counsel, I know that your position is that the letter is capable of acceptance. Of course. And so just putting that aside, I have an academic question. Yes. Under Georgia law, can you use extrinsic evidence to construe the letter and the terms offered in the letter? The language you heard me read from the Frickie case would seem to say you can, but I want to ask you the question. Of course. Thank you, Judge. The basis for a negligence claim is found in the contract. What's the contract say? What was the offer? And so the way I'd like to answer this, because I think it's the clearest way to think about it, is if Nationwide would have just sent one, they could have called up, according to experts, and just said, we accept. But if they just send one sentence, we accept, then this letter that Mr. Mackler wrote would be a contract, and it would be enforceable so long as we could tell what he meant to say. Right. It would be enforceable against him and against the Camachos because he was the drafter. So if there was any ambiguity, if one wanted to create an ambiguity or if there was one, it would be construed against the Camachos. Right. Okay. So far that's first-year law school. That's first-year law school, exactly, which is we don't think there are too many close questions here. But your academic question is, well, what if we have to get to extrinsic evidence? I don't think you get there unless there's a true ambiguity that's not construed against it. That's why I started. I understand your position, and I might even agree with your position. Right. I'm not saying either way, but assuming there is an ambiguity, can you use in Georgia extrinsic evidence? Parallel evidence, extrinsic evidence. And it's interesting because it sounds more like parole evidence, and when I read Fricke it sounds more like parole evidence is what they were talking about. Me too. But the term extrinsic evidence is used in Georgia. I think that you could. I think that if one side or the other went to a judge, and it would be a judge question, not a jury question, and wanted to enforce the contract, and there's an ambiguity, yeah, you probably could bring extrinsic evidence and parallel evidence under contract law. What would that evidence be in this particular case? Well, timing is everything in this case, and nobody ever said anything from Nationwide about being confused as to who Mr. McAleer represented or being confused as to whether he was going to settle both claims with his wrongful death letter. The other extrinsic evidence is this. Before Mr. McAleer was ever hired, there was a lowball $97,000 offer, which Judge Totenberg described as part of the evidence that Nationwide was jacking the Camachos around. And during that lowball offer, they wanted to settle and wanted a general release to settle both the wrongful death and the estate claim. That was just never an issue. It is one of the fabricated issues in this particular case. Judge Totenberg, in her order denying the motion, the JNOV motion, talked about fabricated issues in one of her footnotes. They fabricated these defenses when they finally realized that they should have accepted that reasonable, limited liability release. And again, timing is everything. All of these issues that Nationwide raises on appeal here, raised in the trial court, are after the fact. Timing is everything. They did hire an expert, Judge Black, as you noted. Even their expert admits that the raising of this issue about, oh, we must have a marriage certificate, we must have estate papers, we must be sure that liens are taken care of, etc. All of those issues... Oh, I'm sorry, there's another one. We must have Mr. Park's consent. All of those issues were not raised to Mr. McAleer until after they blew the time limit on the limited liability release. And that's confirmed by their expert. Back for all the interesting discussion we have about these sub-issues. Basically, even if we didn't have those sub-issues, you'd be arguing you were late. You were three days late. That's right. Even if we didn't have the sub-issues. But the sub-issues are just totally manufactured. And insurance companies, we see it as evidence in this case. They do this when they know that they're going to be or could be on the hook for a big case that they blew because they were trying to save themselves money, which is what they're doing, to try to get favorable terms for themselves. That's what they do. It's okay. They can negotiate as long as they get it settled and protect Mr. Park. But when they didn't get what they wanted... Well, your position, I thought, though, with the timeliness, is not that they were trying to get something good for themselves. Somebody back at headquarters just messed up. I mean, they waited three days late to do anything. Yeah. Well, it wasn't even headquarters. It was here. Yeah, but it's a little... What happened was is Ms. Wilson, who was the adjuster here in Duluth, got a directive, and I think the directive actually happened after they realized that they missed the time limit number one and they took a highly unreasonable, even bad faith position, on insisting on a general release to try to save themselves money. Did it also benefit the policyholder if they could get it? Of course it would have benefited Mr. Park, too. But it really was for their benefit. All that, by the way, is kind of explained. It's like, well, gosh, here they are. They're trying to offer their money. What about these terms? All of that actually is explained. How is it that Nationwide is saving itself money? When I was questioning opposing counsel, let's say that opposing counsel on day two writes back and says, I'm just a little concerned here. I want to make sure you're settling both estate and wrongful death. If I don't hear from you, I'm going to assume your answer is you're not, and I'll turn you down. But if you say you are, if he had sent that kind of letter and plaintiff's counsel had not responded, I'm understanding you would agree at that point that you would be in some jeopardy because you had not clarified. In that hypothetical, we might be in some jeopardy, yeah, in that hypothetical. Most definitely would be in some jeopardy, right, because you'd be as tacitly indicating you weren't settling all claims. I think it could possibly be read that way, Your Honor. And that's where they start getting worried about setups, right? Well, yeah, and, of course, the question about this particular case is, was there a setup? There clearly wasn't. I mean, the letter's clear, and there, of course, was an impasse that occurred before the letter. And let's all remember, you know, again, timing is everything in the case. Seventy-some days later, they decide to go ahead and accept the limited liability release after they already realized from an earlier telephone conversation that there's a disagreement over a general liability release versus a limited liability release. It's entirely possible. I am confusing Florida law and Georgia law. But if they had written back to Mr. McClure and said, we don't understand this, would that be construed as a rejection of the offer? You know, these days, I don't think so. There's a case that neither party cited because I'm not sure that it actually hit upon some of the issues raised by Nationwide. But Southern General versus Wellstar is a case that was decided in the Court of Appeals. I'm sorry I can't give you the site, but I think it was decided within the last four years. I thought that actually was helpful to the insurance company, that case. I mean, it's a damned if you do, damned if you don't. Poor insurance company on that one. Their liens, and they say, well, we really, gosh, you know, we need those liens taken care of in a plain box now. And the insurance company case says, okay, we'll give you all your money. Next thing you know, they're out the liens. So how does that help you, that case? That case causes me some qualms about the insurance. I am mentioning as an officer of the court in response to Judge Williams' question, I don't think it was cited by either party. But that case merely holds that the insurance company can ask a question about whether liens are going to be or how liens are going to be handled and that sort of thing. They can ask that question without counter-offering. And that has been termed by Judge Dillard in the Court of Appeals in that case as offering them a safe harbor in terms of at least trying to address the indemnity questions on behalf of their uninsured. But it doesn't really hold that liens have to be taken care of. There just has to be some discussion about it and there has to be some addressing if it's asked about. Excuse me. I don't want your time to pass without talking about the damages issue, which is an unusual issue. Thank you, Your Honor. Interestingly, Nationwide cites the same cases that we would cite, at least one of them. In Campbell v. the United States, which is a United States Supreme Court case, that case emanated from the state of Utah. And that case was a case that addressed punitive damages in the context of an insurance bad faith case and, I guess, an insurance negligence case. In that case, there was $1 million in compensatory damages and $145 million in punitive damages. In our case, in this case, we are only dealing with compensatory damages. There was not a punitive damage charge. Of course, I'm sure the Court knows this, but it's not a punitive damage case. What the United States Supreme Court said in Campbell was compensatory damages, in that particular case it was $1 million, are what the Court calls a concrete loss. That concrete loss, not recognized in these terms, is also recognized by our Supreme Court. I think they're talking, obviously, about analogies. It's not exactly the same. And what they're really saying is, look, Park had no money. Park was never going to pay this. This is just a real windfall for the plaintiff. Keeping in mind, of course, they lost his wife. I'm not saying that was awful. But financially, this was a windfall for them because he was never going to pay it anyway. What did Park care? So what's your answer to that? Well, what we're hearing them say is, you know, an insurance company, under their law, if we take their law on damages, an insurance company doesn't have any obligation to somebody who's poor to try to protect them from a judgment. I mean, insurance laws and bad faith law and negligence law against them is just not available to poor people. That's only available to rich people. We think, as a matter of policy, that's wrong. But we also believe that the Court has already spoken on this. The Supreme Court has already spoken on this. In Breitman v. Cotton States, or Cotton States v. Breitman, excuse me, one of the cases that both parties cite, not only did the Court hold that an insurance company can be held liable for negligence and bad faith, but the Court held that an insured or their assignee, in this case it was an assignment, and so the Camachos had an assignment from Park, have, as a matter of law, compensatory damages equal to the amount of the judgment. The judgment was proximately caused by Nationwide because Nationwide unreasonably failed to settle this case at the expense of their insured. That's what happened in the case, and the law is clear. They can be held liable for their negligence in that regard, at least to the judgment amount, and so we think the law is clear. My time is up. I would be happy to answer other questions if the Court likes. All right, thank you. I think we have time. Thank you very much. Mr. Kinney, on that damages issue, how would you carve it up? How would you say, well, Mr. Park didn't have a lot of money. We only have to pay maybe he had $50,000 in assets. That's all we have to pay for Mr. Park. How would you apportion how much you have to pay for a person that obviously couldn't pay this kind of money, maybe could pay some of it? This is the way you would do it, Your Honor. This happens all the time in tort cases. So, for example, let's follow the facts of this case all the way up until the point of the trial in the federal court. Plaintiff has the burden of proving the damages. Here they've got an $8.1 million excess verdict. The question is, now, if Mr. Park can pay that, then it can be a substitute for any other proof. But if, in fact, he can't, they need to be able to prove that. So, for example, they would have to go in and prove it. All right, we know. None of us here can, I don't think, pay that. So if we know he couldn't pay $8.1 million, how do we figure out then what he could pay? Here's what you do, like you do in any discovery. First, you'd go get his asset. You'd figure out what assets he has. If he's Bill Gates, okay, you know he's got $8 million. I'm telling you, ask me your formula, not what's your formula. Formula is we identify how much he's worth. Yes, how much is he worth. How much is he able to pay on that $8.1 million judgment? If the answer, and a lot of cases we cite them in our brief from other jurisdictions, go down this road. If, in fact, he's got assets, for example, of $200,000 that are collectible, that's what he's exposed. Then he'll have to go bankrupt. And isn't that a pretty heavy hit on your insured to have to go bankrupt? Well, I don't know. I mean, it's hypothetical. I don't know if he would have to go bankrupt. We know he'd have to go bankrupt. He doesn't have $8.1 million. But the alternative, Your Honor, if he has wages, wages could be garnished. That's a possibility, right? Well, that's not so good for him either. You're insured, and now you've got him going bankrupt or getting garnished. None of those things seem very positive. But the point, you've got to remember the animating principle of law here. The point is compensation to him. What do we need to compensate him? And if he is judgment-proof, he's not exposed to $8.1 million. And so the question is, what is he exposed to? What assets are vulnerable to that $8.1 million judgment? So the underlying policy is that bad faith cases can only really have any traction if you're rich. If you're poor, not so much. Your Honor, I think that's a skeptical way, candidly, to look at it. I'm not talking skeptical. Didn't you just tell me I had to look and see how much money he had? No, he might not go bankrupt, but that's what you're saying. Under our tort law, the law of damages applies equally to rich or poor, middle class. It doesn't matter. There's one principle of law. And the principle of law is what would it take to compensate the injured person here? And if the answer is $200,000, the answer is $200,000. If the answer is $8.1 million, the answer is $8.1 million. But the rule of law that they're asking this court, even though Reitman did not hold as a matter of law, you're entitled to excess verdict. But what they want you to do, sitting as a federal court, declaring Georgia law, is that always an invariant, it's never changing, the measure of damages will always be an excess verdict, regardless of the ability of the insured to pay. And under the application of this case, $8.1 million, Mr. Park, that would be an unconstitutional deprivation of due process of nationwide, and I just don't believe the court wants to go down that road. All right. Thank you. Thank you. All right. Our last case is Bazemore.